UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JARVIS BROWN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ANDRE MATEVOUSIAN, et.al.,<br><br>　　　　Defendants. | Case No.: 1:20-cv-00204-NONE-SAB (PC)<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DISMISSAL OF ACTION FOR FAILURE TO STATE A COGNIZABLE CLAIM FOR RELIEF<br><br>(ECF No. 22) |

　　　　Plaintiff Jarvis Brown is appearing *pro se* in this civil rights action pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), which provides a remedy for violation of civil rights by federal actors.

　　　　Currently before the Court is Plaintiff's second amended complaint, filed January 8, 2021.

**I.**

**SCREENING REQUIREMENT**

　　　　The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[] monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555).  Moreover, Plaintiff must demonstrate that each defendant personally participated in the deprivation of Plaintiff's rights.  Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Prisoners proceeding *pro se* in civil rights actions are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor.  Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted).  To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009).  The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" fall short of satisfying the plausibility standard.  Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

## II.

## COMPLAINT ALLEGATIONS

The Court accepts Plaintiff's allegations in the complaint as true only for the purpose of the *sua sponte* screening requirement under 28 U.S.C. § 1915.

As a consequence, Plaintiff served 63 days in disciplinary segregation and was transferred from Victorville to Atwater.  Upon arrival at Atwater, Plaintiff signed up to participate in the Challenge Program (an intense 500 hour in patient behavior modification program offered by the BOP).  Plaintiff was placed in the program in September of 2016.  In November 2016, Defendant Todd assumed coordinator responsibilities for the program.  Defendant Todd is a psychologist who also transferred to Atwater from Victorville.  Defendant Todd had intimate first-hand knowledge of the "16 incident," as it involved a colleague of hers from Victorville.

In April 2017, Plaintiff was placed in administrative detention, pending an SIS investigation, which according to SIS officer Lieutenant Hayes was based on a five page memo Defendant Todd wrote about Plaintiff concluding her professional assessment that Plaintiff was sexually aggressive.

The very first question SIS Hayes asked Plaintiff as he was detaining him was, "why are you here?" Naturally, Plaintiff thought he was referring to why he was in prison. However, Hayes quickly dispelled that notion stating, "No, why are you in this prison? Why did you get transferred here?" referring to the "16 incident." Plaintiff asked what was said, to which Hayes repeatedly stated, "I don't know, she say you have history of it, she say you have a history of it." Clarifying that Defendant Todd's memo was more a product of the circumstances surrounding the "16 incident" at Victorville than it was anything Plaintiff had done at Atwater.

Plaintiff reached out to Defendant Matevousian pleading with him to personally look into the situation as the Plaintiff was essentially in the special housing unit for nothing. Plaintiff's detention was based solely on the "16 incident" and Plaintiff had already served him time for the incident. Defendant Matevousian agreed and assured Plaintiff that if by the end of the investigation it was determined he had not done anything, Plaintiff would be released from the special housing unit.

It would take another 49 days to be released from the special housing unit, but not without incident. About a week before Plaintiff was released from the special housing unit, he got into a heated verbal altercation with a correctional officer, who the Plaintiff does not know and who never had any personal or professional contact with. The altercation began when the Plaintiff honestly told the officer that he missed his cell while serving food, and the officer did not give Plaintiff his food. The officer exploded and yelled at the top of his lungs for every prisoner on the range to hear that "Plaintiff was a sex offender," and "deserved his balls cut off." The officer's statements constituted a death warrant in federal prison. The officer continued to repeatedly yell, "Do your homies know? Did you tell your homies that you're back here for stalking? Did you tell em that? Did you tell em that? I'm surprised they let creeps like you walk the yard."

The officer refused to feed Plaintiff and his cellmate. Because there are no secrets in prison, the posture of the officer's statements, along with the accusations caused a stir as word about the incident quickly began to circulate among the inmate population, subjecting Plaintiff to scrutiny and ridicule by his fellow prisoners.

The SHU orderly or inmate trustee told Plaintiff that officer's told him not to do anything for Plaintiff because Plaintiff was a "como" prison slang for a child molester. This was in response to

3

Plaintiff's request for socks. Upon being dressed out to leave the SHU, Plaintiff walked down the range to resounding chants of "tree jumper, tree jumper, tree jumper. I be he don't jump no mo."

Immediately upon his release from the special housing unit, Plaintiff raised his concerns about being perceived as sexually aggressive toward staff and being labeled as a sex predator or sex offender in a prison setting to Defendant Matevousian. Defendant Matevousian specifically told Plaintiff, "perception isn't reality" and "as long as Plaintiff kept his nose clean he wouldn't have any problems." Plaintiff specifically made Defendant Matevousian aware how that "perception" had already caused him trouble with a correctional officer in the SHU and was beginning to spread among the inmate population.

Defendant Fields openly shared with anyone who inquired about Plaintiff's status while in SHU, and Plaintiff's "homies" were already made aware that Plaintiff was in the SHU for "stalking" due to the five-page memo written by Defendant Todd. This information was given to anyone who asked during "mainline" afternoon meal. However, Plaintiff was released from the SHU without receiving an incident report for "stalking" and was never charged or convicted of a sex offense as documented in his central file. Plaintiff was able to provide documentation demonstrating he was "clean." Although Plaintiff had attempted to prove to the inmate population that he was clean, he still feared for his safety of which Defendant Matevousian was made aware.

On February 12, 2018, Defendant Banks used material false statements to falsify incident report 3088393, alleging sexual assault.

On this same date, Defendant John Doe #1, the operations activities lieutenant at the time Defendant Banks falsified incident report 3088393 failed to comply with the policy and standards set forth in Program Statement 5270.09 Section 541.5 and 18 C.F.R. 541.7, which requires the investigating officer to conduct a complete investigation and states that, "the investigation officer must make every effort to review and preserve video or audio surveillance," to ensure a prohibited act had in fact been committed. Normally, it is at this point in the disciplinary process that evidence which exonerates an inmate is collected and baseless claims or bogus charges are thrown out. However, in reviewing the most critical evidence in controversy, Defendant Cervantes opted to adopt and endorse Defendant Banks' statements.

Defendant John Doe's compliance with policy would have been sufficient to uncover the misconduct of Defendant Banks, but instead constituted an overt act to conspire to violate Plaintiff's constitutional rights.

On February 14, 2018, at Defendant Matevousian's direction, Plaintiff was placed on "limited services," independent of the DHO's finding of guilt. Defendant Matevousian froze or encumbered Plaintiff's account of all personal contacts, phone numbers and email correspondence from the system. In addition, four classification points were added to Plaintiff's custody points elevating his custody status from high to max and a sexual offender public safety factor was erroneously lodged against Plaintiff and placed in his central file.

Defendant Matevousian intentionally had Plaintiff miscalculated as a sex offender knowing that "keeping his nose clean" would be virtually impossible. Based on the sex offender classification, Plaintiff faced a substantial risk of being stabbed or injured by other inmates.

Defendants Hess and Auterson were both made aware of Defendants Banks and Cervantes misconduct and the existence of exculpatory video footage exonerating Plaintiff through letters written and personally given to them by Plaintiff. The letters fully outlined the misconduct and the Plaintiff's innocence. However, instead of taking action to help, investigate or correct both took extraordinary actions to do the opposite by endorsing an unlawful referral for Special Management Unit (SMU) designation.

Further, appeals were made to Defendant Hess to lift the restrictions of being on limited services, so Plaintiff would at least have access to the phone and law library. In reference to Defendant Matevousian, Defendant Hess asked, "What you do to piss the old man off?"

On February 22, 2018, right before the controversy was brought before Defendant Cervantes, the disciplinary hearing officer (DHO), a phone conference was set up and facilitated by Defendant Chavez, the DHO administrative assistance between Plaintiff and his then appointed staff representative. At said conference, Defendant Reid stated that recorded video surveillance showed Plaintiff reaching in Defendant Banks direction three times, but the Special Investigative Services (SIS) personnel who reviewed the footage with him could not determine whether Plaintiff touched/assaulted Defendant Banks. When asked to give his opinion on what he personally observed

in the video as to whether Defendant Banks had been sexually assaulted, Defendant made it clear, "I can't do that." When asked for his professional opinion on the same, he stated, "I can't do that either." When asked if he or the SIS personnel utilized the zoom feature on the camera or if the Plaintiff's reach in Defendant Banks direction could have been consistent with pointing, Defendant Reid refused to clarify one way or the other.

At that time, Plaintiff opted to exercise his right to change staff representative as codified in Program Statement 5270.09 on inmate discipline, those repeated requests were denied by Defendant Chavez who ultimately coerced Plaintiff into waiving his right to no staff representative altogether with an ultimatum guised as a scheduling conflict. Either proceed with Defendant Reid despite his pronounced and significant profound reluctance to assist Plaintiff or wait an additional 2 or 3 weeks. At that time, Plaintiff waived his right to staff representation.

During the hearing, Defendant Cervantes went to great lengths to sabotage and bar Plaintiff's opportunity to be heard and therefore obtain the possibility of pursuing and procuring vindication and/or the relief to which he was entitled. The Bureau of Prisons directs the DHO to consider all evidence presented at the hearing and to make a decision based on same facts, and if there is conflicting evidence to base the decision on the greater weight of the evidence. Instead of reviewing irrefutable camera footage and letting the evidence speak for itself, Defendant Cervantes took extraordinary steps to suppress it. Even altering documentary evidence submitted to supplement the most dispositive item of proof and most critical component of Plaintiff's defense concrete and irrefutable video evidence. Defendant changed the date on the safety log Plaintiff submitted to show what he was pointing at in the video after Defendant Banks snatched the binder out of Plaintiff's hands to corroborate Banks account. When Plaintiff repeatedly informed Defendant that the statement of safety administrator was specifically solicited to verify his being sent to the psychology department to conduct his duties as the safety orderly, Defendant Cervantes went out her way to misrepresent the fact.

When presented with the fact that according to Defendant Banks, Plaintiff rubbed her hand in a very sexual way, she immediately said stop, then the Plaintiff tried to grab her again. Instead of immediately alerting her coworker who was just two feet away or activating her alarm, Banks simply

6

escorted Plaintiff out of the department and wrote an incident report two and a half hours later after profiling Plaintiff to which Defendant Cervantes responded, "it's not looking good for you." Plaintiff repeatedly requested that Cervantes not take Banks word for it and to review the camera footage, but Defendant spent the majority of the hearing lecturing Plaintiff on how no woman deserves to be touched without her permission or consent. Plaintiff was not allowed to present exculpatory evidence to demonstrate that he did not commit the prohibited act. Defendant Cervantes was more interested in Plaintiff's negative history that seemed to substantiate the negative narrative being disseminated by staff about Plaintiff. Cervantes specifically asked "what happened in 16?" referring to a letter Plaintiff wrote to a female psychologist alleged to contain a sexual proposal. Defendant Cervantes was argumentative, hostile, combative and unprofessional during the proceeding making it impossible to overcome Defendant's bias. Plaintiff was found guilty of sexual assault.

Defendant Cervantes covered up the misconduct of Defendant Banks with misconduct of her own. Defendant Cervantes used falsified evidence to obtain a finding of guilt and because Defendant Banks intentionally fabricated charges knowing Plaintiff would be immediately placed in segregation, Cervantes actions not only deprived Plaintiff of equal protection under the law, but also deprived him of the right to avoid additional and unconstitutional restraint.

When it was in her power to do so, Defendant Mitchell failed to remedy or rectify outstanding and ensuing constitutional violations. Even after being made completely aware of the discriminatory manner in which Defendant Cervantes conducted Plaintiff's hearing. Defendant Mitchell opted to kick the Plaintiff's appeal back to Defendant Cervantes for reconsideration despite the glaring and pronounced conflict of interest. Defendant Mitchell not only "turned a blind eye" to Defendant Cervantes's misdeeds, but her "inaction" made the Plaintiff vulnerable to more constitutional violations. When Defendant Mitchell allowed the proverbial wolf to guard the chicken coup, throwing the Plaintiff to the wolves right along with his "few" constitutional guarantees.

As Regional Director Defendant J. Baltazar reviewed the actions taken by Defendant Cervantes and went to great lengths to justify Cervantes's actions. Baltazar conceded that "the record does not indicate the DHO reviewed video evidence," and failed to comply with BOP regulations and policy.

1    Defendant Ian Connors reviewed Defendants' actions and opted to participate in the cover up
2    by turning a blind eye to the misconduct furthering the BOP's culture of protective suppression.
3    Plaintiff was also prejudiced by the posture of collusion demonstrated by Defendants Fields
4    and Stockton who failed to act in accordance with BOP sexual abuse policy which requires that prison
5    personnel are required to personally collect, review and preserve all evidence.
6    Immediately after Defendant Cervantes's finding, Plaintiff submitted a request for preservation
7    of any and all video footage for any subsequent appeals.  The following week or on the SIS next SHU
8    round, Plaintiff inquired about the status and priority of his request.  Initially the inquiry was directed
9    to another member of the SIS personnel who ultimately deferred to Defendant Fields.  Fields
10   responded, "we don't work for you, it don't work like that. We work for the Central Office direct all
11   your requests there."
12   On March 13, 2018, Plaintiff was interviewed by Defendant Stockton.  Defendant initiated the
13   interview by stating, "I'm not letting you back on this yard."  When Plaintiff professed his innocence
14   and went in depth about the fact that Defendant Banks lied, Defendant Stockton responded by asking,
15   "Do you think you were standing close to her?"  Defendant Stockton was referring to Defendant
16   Banks  and indicated having personally seen the footage.  When Plaintiff asked Defendant if she was
17   going to "look" into the misconduct of Defendant Banks, Stockton responded by reassuring Plaintiff,
18   "the shots going to stick Brown, the shots going to stick," referring to the incident report Defendant
19   Banks fabricated.
20   Plaintiff enlisted Defendant Cipion's assistance in compiling documentation evidence and
21   written witness statements.  Plaintiff also requested Defendant Cipion review video footage of alleged
22   sexual assault which SMU designation referred was predicated and to forward a summary of what he
23   witnessed to SMU hearing administrator for his consideration.  Defendant Cipion expressed a degree
24   of enthusiasm upon conferring with Plaintiff and advised him that he, the Defendant, was going
25   directly to SIS to review the footage.
26   The next time Plaintiff heard from Defendant Cipion, instead of collecting documentary
27   evidence, written witness statements and reviewing the footage as requested, Defendant Cipion did an
28   "about face" and went to great lengths to sabotage Plaintiff's efforts to present exculpatory/mitigating

evidence by interviewing Defendant Banks and Defendant Todd and those sympathetic to her prevarication.

Defendant John Doe #2 allowed postponement of the hearing until May 17, 2018 which allowed Plaintiff to confer with Defendant Cipion on collecting the requested documentary evidence. However, it became clear that Cipion would not comply with BOP policy. Instead of allowing Plaintiff to get another staff representative, Defendant John Doe 2 deemed that right to be irrelevant and proceeded with the hearing without allowing Plaintiff to present exculpatory evidence.

Defendant Reid stated that he would do what he could to rectify the situation by talking with DHO Defendant Cervantes. On the Defendant's next SHU round, Defendant Reid stated that he had contacted Defendant Cervantes and according to her at that point all Plaintiff could do was appeal. Plaintiff asked Defendant Reid if he would be willing to write a statement on Plaintiff's behalf as to the Defendant's observations and actual involvement. Initially, Defendant expressed a willingness, but then returned stating, "I'm sorry, I can't, they told me I can't help an inmate with an appeal like that. I can't write a statement like that." As Plaintiff continued to press the Defendant's obligation as a Chaplain to speak the truth, he finally admitted, "I can't get involved, it's over my head. They want you and there's nothing I can do."

At some point ITS supervisor Mr. Beardsly made a SHU round and made it absolutely clear as to the overall posture being taken toward Plaintiff. When Plaintiff stopped him to inquire about the restrictions that had been placed on his personal account, Mr. Beardsly responded by saying, "Oh you're the 'fire extinguisher guy' oh I can 'guarantee' you ain't got nothing coming." Plaintiff then asked if he had seen the footage, he stated that he hadn't but added "you're hit," as he walked away.

In compliance with the Prison Rape Elimination Act (PREA) that requires facilities within the BOP to adopt a zero-tolerance to rape and sexual abuse, Defendant Matevousian was notified about the alleged assaulted and had active and constructive notice of all the pertinent evidence, i.e. irrefutable camera footage that captured the misconduct of Defendant Banks. Instead of taking action to investigate and assist Plaintiff, Matevousian intentionally took action to limit Plaintiff's ability to seek recourse at the institutional level.

///

Defendants John Doe #3, John Doe #4, Lake and Connors all sustained Plaintiff's designation to a SMU, despite John Doe #1's failure to substantially comply with BOP regulations and policy.

### III.

### DISCUSSION

**A. Deliberate Indifference to Plaintiff's Safety**

The Supreme Court has recently emphasized that "the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity," which is "in accord with the Court's observation that it has 'consistently refused to extend Bivens to any new context or new category of defendants.' " Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017) (first quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009); then quoting Correctional Services Corp. v. Malesko, 534 U.S. 61, 68 (2001)). Abbasi sets forth a two-part test to determine whether a Bivens claim may proceed. 137 S. Ct. at 1859-60. A district court must first consider whether the claim presents a new context from previously established Bivens remedies, and if so, it must then apply a "special factors" analysis to determine whether "special factors counsel hesitation" in expanding Bivens in the absence of affirmative action by Congress. Id. at 1857-60.

"If [a] case is different in a meaningful way from previous Bivens cases decided by [the Supreme Court], the context is new." Id. at 1859. The Abbasi Court provided several non-exhaustive examples of differences meaningful enough to make a given context a new one: "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider." Id. at 1859-60.

To date, the Supreme Court has only recognized a Bivens remedy in the context of the Fourth, Fifth, and Eighth Amendments. See Abbasi, 137 S. Ct. at 1860 (Supreme Court has approved three Bivens claims in the past); Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) (Fourth Amendment prohibition against unreasonable searches and seizures); Davis v. Passman, 442 U.S. 228 (1979) (Fifth Amendment gender-discrimination); Carlson v. Green, 446 U.S. 14 (1980) (Eighth Amendment Cruel and Unusual Punishments Clause). The Supreme Court has never

implied a Bivens action under any clause of the First Amendment. See Reichle v. Howards, 566 U.S. 658 n.4 (2012) ("We have never held that Bivens extends to First Amendment claims."); Bush v. Lucas, 462 U.S. 367 (1983) (declining to extend Bivens to a First Amendment claim); but see Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009) ("we have declined to extend Bivens to a claim sounding in the First Amendment . . . Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under Bivens.").

In Garraway v. Cuifo, No. 1:17-cv-00533-DAD-GSA (PC), 2020 WL 860028 (E.D. Cal. Feb. 21, 2020), this Court found a failure to protect claim cognizable under Bivens reasoning as follows:

> In *Farmer*, the plaintiff, a transwoman, alleged in an Eighth Amendment Bivens action that she was attacked and raped after being placed in the prison's general population even though prison officials knew that she would be "particularly vulnerable to sexual attack[.]" *Farmer v. Brennan*, 511 U.S. 825, 830-31, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Without dissent, the Supreme Court addressed the case on its merits, acknowledged the plaintiff's claim as cognizable, and remanded the matter to the trial court for further proceedings. *Id.* at 847-851, 114 S.Ct. 1970. The same theory underlies both *Farmer* and the present case: prison officials demonstrating deliberate indifference to an inmate facing the substantial risk of violent attack by other inmates.
>
> It is true that the Supreme Court later wrote that "three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself" and "urged caution before extending *Bivens* remedies into any new context" because "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, ___ U.S. ___, 137 S.Ct. 1843, 1855, 1857, 198 L.Ed.2d 290 (2017) (citation omitted). But the *Abbasi* majority made no mention of *Farmer*, "a [1994] *Bivens* case alleging that prison wardens were deliberately indifferent to an inmate's safety," even though the Court had previously made clear that "conditions-of-confinement claims and medical-care claims are subject to the same substantive standard." *Abbasi*, ____ U.S. ____, 137 S.Ct. 1843, 1878, 198 L.Ed.2d 290 (4-2 decision) (Breyer, J., dissenting) (2017) (citations omitted).
>
> As noted above, in *Farmer*, the Supreme Court specifically held—*in the context of a* Bivens *claim*—that a prison official could "be held liable under the Eighth Amendment for denying humane conditions of confinement," emphasizing that "prison officials have a duty…to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833-34, 848, 114 S.Ct. 1970. It would be incongruous to regard *Farmer* as a "new context" when the Supreme Court in that case recognized a *Bivens* claim under the Eighth Amendment for a failure to protect an inmate from violence by other prisoners.
>
> Though the majority in *Abbasi* did not acknowledge that the Court had explicitly "approved of an implied damages remedy" in *Farmer*, neither did it reject that it had recognized the availability of a *Bivens* remedy in the context presented by *Farmer*. *See Abbasi*, 137 S.Ct. at 1857 (listing eight cases where it had "declined to create an implied damages remedy" but not

11

> including *Farmer*). (footnote omitted)  The Supreme Court has discouraged lower courts from renouncing its precedent on the belief that such cases were overruled by implication, instead directing the lower courts to "follow the case which directly controls," even if that precedent "appears to rest on reasons rejected in some other line of decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *see also Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987) ("Repeals by implication are not favored[.]"); *Bosse v. Oklahoma*, ___ U.S. ___, 137 S.Ct. 1, 2, 196 L.Ed.2d 1 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.") (citation omitted). The Supreme Court's decision in *Farmer* is a cornerstone of Eighth Amendment jurisprudence and remains binding authority.

Garraway, 2020 WL 860028, at *1-2.  Based on the reasoning set forth above in Garraway, the Court finds that Bivens extends to a failure to protect claim.  However, for the reasons explained below, Plaintiff fails to state a cognizable claim for deliberate indifference to his safety.

A prisoner may state a Section 1983 claim under the Eighth Amendment against prison officials where the officials acted with deliberate indifference to the threat of serious harm or injury to him. Labatad v. Corrections Corp. of America, 714 F.3d 1155, 1160 (9th Cir. 2013); see Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986) (stating same with respect to harm inflicted by another inmate). "Deliberate indifference" has both subjective and objective components. Labatad, 714 F.3d at 1160. First, a prison official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists. Then, the official must also draw the inference. See id. at 1160 (citing to Farmer v. Brennan, 511 U.S. 825, 837 (1994) (internal quotations omitted)). Liability may follow only if a prison official knows that inmates face a substantial risk of serious harm and the official disregards that risk by failing to take reasonable measures to abate it. Labatad, 714 F.3d at 1160.

As applicable here, the intentional and false labeling of an inmate as a sex offender may give rise to a claim for deliberate indifference under the Eighth Amendment.  See Johnson v. Robinson, No. 2:12-CV-2400-WBS (DAD), 2015 WL 882021, at *14 (E.D. Cal. Mar. 2, 2015), report and recommendation adopted, 2015 WL 3603942 (E.D. Cal. June 5, 2015), aff'd, 692 F. App'x 371 (9th Cir. 2017) (finding defendant's intentional, retaliatory misclassification of plaintiff as a sex offender sufficiently stated a claim for deliberate indifference, noting "the seriousness of the 'sex offender' label in prison is tangible enough to support, in certain circumstances, a claim that a defendant used

the dangerous implications of that label or ignored them in deliberate indifference to an inmate's safety"); Knight v. Runnels, No. CIV S-07-0751-FCD-CMK (P), 2007 WL 2390139 at *2 (E.D. Cal. Aug. 20, 2007) (finding both prongs of a deliberate indifference claim sufficiently pled where plaintiff "allege[d] that this defendant put a 'R-suffix' in his file knowing that, if plaintiff was put in the general population, he would be stabbed"); Sims v. Woodford, No. 1:05–cv–1523–LJO–DLB (PC), 2008 WL 669943 at *5 (E.D. Cal. Mar. 7, 2008) (denying a motion to dismiss under Rule 12(b)(6) where the plaintiff had pled that "defendants errantly classified him as a convicted sex offender, and failed to remove that classification subsequent to correspondence from the court to the contrary"); Nailing v. Fosterer, No. CIV S–09–2475–MCE–CMK, 2012 WL 1130655 at *8 (E.D. Cal. Mar.2, 2012) (finding a cause of action sufficiently pled because "a reasonable jury could conclude that defendants were deliberately indifferent to the generally known risk sex offenders face in the prison general population").

Here, based on Plaintiff's allegations that it well known that inmates labeled as a sex offender in front of other inmates are targeted, Plaintiff's only cognizable claim for deliberate indifference is against the unidentified officer who "yelled" that Plaintiff was a sex offender in range of other inmates.  However, it does not appear that Plaintiff is seeking liability against that individual officer, as he not identified as a Defendant by way of Doe identification or otherwise.

As to Warden Matevousian, a government official may be held individually liable under Section 1983 for acts taken in a supervisory capacity, but only when the supervisor's own misconduct caused an alleged constitutional deprivation. See Iqbal, 556 U.S. at 676, 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); OSU Student Alliance, 699 F.3d at 1069 (supervisor liable under Section 1983 only if "he … engaged in culpable action or inaction himself") (citing Iqbal, 556 U.S. at 676).

A supervisor may "cause" a constitutional deprivation for purposes of Section 1983 liability, if he or she (1) personally participated in or directed a subordinate's constitutional violation; or (2) was not "physically present when the [plaintiff's] injury occurred," but the constitutional deprivation can, nonetheless, be "directly attributed" to the supervisor's own wrongful conduct. See Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011).  Allegations regarding causation "must be individualized and focus

1  on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to
2  have caused a constitutional deprivation." Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988)
3  (citations omitted).  Here, there are insufficient allegations that Warden Matevousian personally
4  participated in the unidentified officer's conduct in "yelling" that Plaintiff was a sex offender in the
5  range of other inmates.  Therefore, Plaintiff fails to state a cognizable claim against Warden
6  Matevousian.

7  Furthermore, the mere fact that Plaintiff claims several Defendants ignored exculpatory
8  evidence in finding him guilty of sexual assault does not support a claim for deliberate indifference.
9  While Defendants may have plausibly known the danger a sex offender label could impose on
10 Plaintiff, only the unidentified officer's conduct in telling other inmates of such label supplies the state
11 of mind necessary to plead a claim of deliberate indifference under the Eighth Amendment.
12 Vanlandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).  There are insufficient facts that
13 any of the named Defendants knowingly found Plaintiff guilty of a rules violation report to subject
14 him to harm by other inmates. Accordingly, Plaintiff fails to state a cognizable claim for relief.

15 **B.     Due Process Violation**

16 Plaintiff alleges a procedural due process violation during prison disciplinary hearing and his
17 subsequent placement determinations.  However, as stated in the Court's prior screening order, it is
18 clear that Plaintiff's due process claims involve a new
19 context.

20 The Supreme Court has never extended Bivens in the context of a prisoner's due process claim
21 arising out of a prison disciplinary proceeding or a placement determination. See Vega v. United
22 States, 881 F.3d 1146, 1152 n.2 (9th Cir. 2018) (Bivens never expanded in context of due process
23 claims arising out of prison disciplinary process and, therefore, plaintiff's claims "plainly present a
24 'new context' under Abbasi") (discussing FDIC v. Meyer, 510 U.S. 471, 473-74 (1994) (procedural
25 due process)); Schweiker v. Chilicky, 487 U.S. 412, 414 (1988) (procedural due process); United
26 States v. Stanley, 483 U.S. 669, 671-72 (1987) (substantive due process); Chappell v. Wallace, 462
27 U.S. 296, 297, 304-05 (1983) (substantive due process); see also Buenrostro v. Rajardo, No. 1:14-cv-
28 00075-DAD-BAM (PC), 2017 WL 6033469, at *3 (E.D. Cal. Dec. 5, 2017) (declining to find an

14

implied Bivens cause of action for Fifth Amendment due process or for First Amendment retaliation), subsequently aff'd sub nom. Luis Buenrostro v. Fajardo, 770 F. App'x 807 (9th Cir. 2019); Chambers v. Herrera, No. 5:17-cv-2564-MWF-KES, 2019 WL4391135, at *7 (C.D. Cal. July 9, 2019) (declining to expand Bivens to due process claims arising from prison disciplinary proceedings); Hunt v. Matevousian, 336 F.Supp.3d 1159, 1169 (E.D. Cal. 2018). Plaintiff's Fifth Amendment due-process claims are accordingly subject to dismissal.

The Supreme Court's precedents "now make clear that a Bivens remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " Abbasi, 137 S.Ct. at 1857. Such inquiry includes "whether there were other alternative remedies available or other 'sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy' in a suit like this one." Abbasi, 137 S.Ct. at 1865.

Here, Plaintiff had alternative remedies available. First, Plaintiff had access to the Administrative Remedy Program, which allows "an inmate to seek formal review of an issue relating to any aspect of his … own confinement." 28 C.F.R. § 542.10(a). Although Plaintiff contends that some of his appeal remedies were not available, the mere fact that he was not successful in obtaining relief through such program "does not mean that he did not have access to alternative or meaningful remedies." Vega, 881 F.3d at 1155. Second, Plaintiff may seek injunctive relief in an effort to accomplish policy changes. "[U]nlike the Bivens remedy, which [the Supreme Court has] never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 74 (2001); see also Abbasi, 137 S.Ct. at 1862-63 (noting that unlike Bivens, "in which 'it is damages or nothing,' " plaintiffs may seek injunctive relief for "large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners"); Zavala v. Rios, 721 F. App'x 720, 721-22 (9th Cir. 2018) ("Under Ziglar, an extension of Bivens is not available here because … Zavala may seek injunctive and declaratory relief."), cert. denied, 139 S.Ct. 464 (2018). Such alternative remedies support this court's finding that a Bivens remedy should not be extended. "[A]n alternative remedy need not be 'perfectly congruent' with Bivens or 'perfectly comprehensive[.]' " Rodriguez v. Swartz, 899 F.3d 719, 739 (9th Cir. 2018) (citations and footnotes

omitted). "So long as the plaintiff ha[s] an avenue for some redress, bedrock principles of separation of powers foreclose[ ] judicial imposition of a new substantive liability." Malesko, 534 U.S. at 69.

In addition, the lack of Congressional action in this area is a special factor that also counsels hesitation by this court. As the Supreme Court noted in Abbasi, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." Abbasi, 137 S.Ct. at 1865. In 1995, Congress passed the Prison Litigation Reform Act, stating "in dicta that the Act's exhaustion provisions would apply to Bivens suits," yet provided no "standalone damages remedy against federal jailers." Abbasi, 137 S.Ct. at 1865. As another magistrate judge noted, Congress acted "with the intent to 'reduce the quantity of inmate suits.' " Reid v. United States, No. 1:14-cv-01163-LJO-MJS (PC), 2018 WL 1588264 (E.D. Cal. Apr. 2, 2018), quoting Jones v. Bock, 549 U.S. 199, 223 (2007). Thus, the Court finds that inaction by Congress also counsels hesitation in extending Bivens to the contexts presented here.

### B.     No Leave to Amend

The Court will recommend that the second amended complaint be dismissed without leave to amend because Plaintiff was previously notified of the deficiencies and has failed to correct them. A plaintiff's "repeated failure to cure deficiencies" constitutes "a strong indication that the [plaintiff] has no additional facts to plead" and "that any attempt to amend would be futile[.]" See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1008 (9th Cir. 2009) (internal quotation marks omitted) (upholding dismissal of complaint with prejudice when there were "three iterations of [the] allegations—none of which, according to [the district] court, was sufficient to survive a motion to dismiss"); see also Simon v. Value Behavioral Health, Inc., 208 F.3d 1073, 1084 (9th Cir. 2000) (affirming dismissal without leave to amend where plaintiff failed to correct deficiencies in complaint, where court had afforded plaintiff opportunities to do so, and had discussed with plaintiff the substantive problems with his claims), amended by 234 F.3d 428, overruled on other grounds by Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir. 2007); Plumeau v. Sch. Dist. 40 Cnty. of Yamhill, 130 F.3d 432, 439 (9th Cir. 1997) (denial of leave to amend appropriate where further amendment would be futile).

Because Plaintiff has been given two prior opportunities to amend the complaint to cure the deficiencies and was unable to do so, the Court will recommend that the dismissal be without leave to amend. Where a "plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." Zucco, 552 F.3d at 1007 (quotations and citations omitted). The Court finds that granting further leave to amend would be futile because Plaintiff was previously notified of the deficiencies and failed to fix them in the second amended complaint.

## IV.
## CONCLUSION AND RECOMMENDATION

Based on the foregoing, Plaintiff fails to state a cognizable claim for relief and further leave to amend would be futile.

Accordingly, it is HEREBY RECOMMENDED that the instant action be dismissed, without leave to amend, for failure to state a cognizable claim for relief.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **fourteen (14) days** after being served with this Findings and Recommendation, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **March 31, 2021**

UNITED STATES MAGISTRATE JUDGE